UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JEANINE NARCISSE, ET AL.,**

**Plaintiffs,**

**- against -**

**PROGRESSIVE CASUALTY INSURANCE COMPANY, ET AL.,**

**Defendants.**

**23-cv-4690 (JGK)**

**Memorandum Opinion and Order**

**John G. Koeltl, District Judge:**

The plaintiffs, Jeanine Narcisse, Pamela Palaszynski, Jennifer Chandler, and Pierre Anelis, bring this putative class action on behalf of car owners whose vehicle total-loss claims, paid to non-party lienholders, were allegedly undervalued by the defendants, Progressive Casualty Insurance Company ("Progressive Casualty"), Progressive Max Insurance Company ("Progressive Max"), Progressive Advanced Insurance Company, and Progressive Specialty Insurance Company (collectively, "Progressive" or the "defendants"). The plaintiffs allege claims for breach of contract and violation of New York General Business Law § 349. Progressive moved to dismiss the plaintiffs' claims for lack of subject matter jurisdiction and for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). That motion was denied. The plaintiffs now move for class certification. For the following reasons, the plaintiffs' motion for class certification is **denied**.

## I.

The factual background of this case has been set forth in the Court's previous decision denying the defendants' motion to dismiss. See Narcisse v. Progressive Cas. Ins. (Narcisse I), 778 F. Supp. 3d 597, 600–03 (S.D.N.Y. 2025). Familiarity with that decision is assumed. The following factual and procedural background is undisputed unless otherwise noted.

The plaintiffs are four New York residents who had automobile insurance underwritten by Progressive. Under Progressive's standard New York policy, Progressive pays a policyholder whose covered vehicle has been totaled the lowest of "(a) the actual cash value of the stolen or damaged property at the time of the loss reduced by the applicable deductible; (b) the amount necessary to replace the stolen or damaged property reduced by the applicable deductible; (c) the amount necessary to repair the damaged property to its pre-loss condition reduced by the applicable deductible; or (d) the Stated Amount shown on the declarations page for that covered auto." Narcisse Mot. Class Certification ("Mot."), Ex. 3 (the "Policy") at 39, ECF No. 92-3. The actual cash value ("ACV") is "determined by the market value, age, and condition of the vehicle at the time the loss occurs." Id. at 40.

Progressive uses software designed by Mitchell International, Inc., called WorkCenter Total Loss ("WCTL"), to value vehicles. See Defs.' Opp'n Pls.' Mot. Class Certification ("Opp'n") Ex. E at 2, ECF No. 97-6. The software is approved by the New York Department of Financial Services and is the industry standard. See id. Progressive adjusters first evaluate the totaled vehicle

for characteristics such as "mileage, VIN, options, condition, [and] aftermarket parts." Mot. 7. After Progressive enters vehicle information into the WCTL program, the program generates a vehicle valuation report (the "Instant Report"), providing the specific vehicle's market value. Mot. Ex. 2, at 37, ECF No. 92-2. Multiple reports with different values may be generated for the same vehicle. Opp'n Ex. G, at 70:19–71:25, ECF No. 97-8.

The WCTL calculates the value by "locat[ing] comparable vehicles that have recently sold or are listed for sale in the insured's local market area." Mot. 6; see also Opp'n Ex. F ("WCTL Resource Guide"), at 11, ECF No. 97-7; Pls.' Second Am. Compl. ("SAC"), Ex. 1, at 16, ECF No. 74-1. Once the comparable vehicles are identified, WCTL applies what it calls a Projected Sold Adjustment ("PSA") "to estimate what a comparable vehicle listed for sale will sell for." Mot. 7; see also WCTL Resource Guide 30. Progressive contends that the PSA reflects real-world negotiations, which are common for used vehicles. Opp'n 6–7. J.D. Power calculates the PSA by comparing the actual sold prices at thousands of dealerships (the "Power Information Network" or "PIN") to the advertised list prices of comparable vehicles. WCTL Resource Guide 30–31; Mot. Ex. 10 ("Bogus Dep."), at 21–23, ECF No. 92-10. The PSA is not applied to vehicles listed at no-haggle dealerships. SAC Ex. 3, at 10, ECF No. 74-3; SAC Ex. 4, at 9, ECF No. 74-4.

WCTL also adjusts the prices of comparable vehicles to account for differences in condition between the loss vehicle and comparable vehicles. See, e.g., SAC Ex. 4, at 5. The prices of the comparable vehicles after the

adjustments are averaged to reach a base value. Id. The base value of the loss vehicle is adjusted based on the condition ratings of the interior, exterior, mechanics, and tires to reach the market value. Id. Finally, taxes, fees, and deductibles are applied to the market value to determine the payout. Id. at 2.

The plaintiffs argue that the PSA is a rigged deduction that artificially deflates the ACV calculation. First, they allege that the PIN is unreliable because there has been no analysis to determine whether it is representative of the general market and neither Progressive nor Mitchell has records of the complete data. Mot. 4. Second, they allege that most vehicles are sold at list price according to their expert. Id. Third, the plaintiffs assert that, to apply a PSA deduction, J.D. Power deleted transactions where the sold price exceeds the list price and excluded every transaction where the vehicle sold for list price (until July 2021). Id. at 5; Bogus Dep. at 57–60; Mot. Ex. 8 ("Lacey Expert Report"), at 3–6, ECF No. 92-8. The plaintiffs contend that Progressive breached the terms of the Policy by applying the PSA and deceived consumers of automobile insurance policies in violation of New York General Business Law § 349.

The defendants moved to dismiss the plaintiffs' claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF No. 34. The Court denied that motion on April 15, 2025. ECF No. 68. The plaintiffs now move to certify various subclasses on behalf of similarly situated policyholders based on their claims. ECF No. 92.

## II.

Before certifying a class, a court must determine that the party seeking certification has satisfied the four prerequisites of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. See Fed. R. Civ. P. 23(a); Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 201–02 (2d Cir. 2008). The Court must find, more specifically, that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."[1] Fed. R. Civ. P. 23(a).

The court must also find that the class qualifies under one of the three sets of criteria set forth in Rule 23(b). See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613 (1997). Rule 23(b)(3)—the subsection invoked by the plaintiffs in this case—provides that a court may certify a class seeking damages only if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). If the requirements of 23(a) have been met, and the claims fall within the scope of Rule 23(b)(3), a court may, in its discretion,

---

1 Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

certify the class. See In re Initial Pub. Offerings Sec. Litig. ("In re IPO"), 471 F.3d 24, 41 (2d Cir. 2006).

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). Plaintiffs seeking class certification bear the burden of demonstrating by a preponderance of the evidence that the proposed class meets each of the requirements for class certification set forth in Rule 23. Teamsters, 546 F.3d at 202. When assessing whether plaintiffs have met this burden, courts must take into account "all of the relevant evidence admitted at the class certification stage." In re IPO, 471 F.3d at 42. A court may certify a class only after determining that "whatever underlying facts are relevant to a particular Rule 23 requirement have been established." Id. at 41. "[T]he obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue," although a court "should not assess any aspect of the merits unrelated to a Rule 23 requirement." Id.

**III.**

The plaintiffs in this case seek to certify various damages classes pursuant to Rule 23(b)(3) on behalf of:

> [a]ll persons (a) who made a first-party claim on a policy of insurance issued by [Progressive] to a New York resident where, from the earliest allowable time through the date an order granting

> class certification is entered, [Progressive] determined that the vehicle was a total loss, based its claim payment on an Instant Report from Mitchell where a Projected Sold Adjustment was applied to at least one comparable vehicle, and (b) whose claim was not released in the settlement approved in Volino v. Progressive Casualty Ins. Co., No. 1:21-cv-06243-LGS (S.D.N.Y.).[2]

SAC ¶ 106. In Volino, the district court certified a similar class but excluded those insureds who "had outstanding debt on their vehicles and [GAP] insurance," because, the court reasoned, any settlement paid by Progressive in those circumstances would go to the vehicle's "lienholder, not an insured class member." Volino v. Progressive Casualty Insurance Co., No. 21-cv-6243, 2023 WL 2532836, at *10 (S.D.N.Y. Mar. 16, 2023). By excluding insureds whose claims were not released by the settlement approved in Volino, the plaintiffs in this action seek to represent those "claimants in New York who owed more on their financing than they received in insurance benefits so that all compensation for the claimants' benefits passed through directly to the totaled vehicle's lienholder." SAC at 2 n.2.

---

[2] The plaintiffs propose four subclasses for the breach-of-contract claim, one against each defendant, and four subclasses for the § 349 claim, one against each defendant. The § 349 subclasses are identical to the breach of contract classes, except for applying to individuals who made "claims" as opposed to "first-party claims." SAC ¶ 106. For the purposes of this Memorandum Opinion and Order, all references and reasoning for the putative class action apply to all subclasses.

The defendants oppose certification and contend that the plaintiffs have failed to show that Federal Rule 23(b)(3)'s predominance standard has been satisfied.[3] See Opp'n 10–20.

To satisfy the predominance requirement, "a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 136 (2d Cir. 2001), abrogated on other grounds by In re IPO, 471 F.3d at 24.

In this case, issues subject to individualized proof predominate over the issues that are subject to generalized proof. For the breach-of-contract claim, proof of breach turns on Progressive's contractual obligation. Progressive's duty under the Policy is to pay ACV, not to use any particular method. Therefore, individual evidence of each specific vehicle's ACV will predominate over generalized proof of alleged PSA manipulation. For the § 349 claim, individualized issues of harm and exposure to misrepresentations will predominate

---

3 In its Memorandum Opinion and Order denying the defendants' motion to dismiss, the Court already held that the named plaintiffs have established standing. See Narcisse I, 778 F. Supp. 3d at 603–10. The Court therefore has assured itself of its jurisdiction over the named plaintiffs' claims and proceeds to the requirements of Rule 23. To the extent the defendants challenge the standing of absent class members, the Court need not resolve that issue before deciding certification. Class certification is logically antecedent to the standing of absent class members. Amchem, 521 U.S. at 612–13; see also Ortiz v. Fibreboard Corp., 527 U.S. 815, 831 (1999) ("[C]lass certification issues are, as they were in Amchem, logically antecedent to Article III concerns.").

over generalized issues regarding the PSA calculations or the materiality of Progressive's alleged misstatements. Because plaintiffs cannot satisfy predominance, the Court need not address superiority or the Rule 23(a) requirements.

**A.**

The plaintiffs first argue that generalized issues will predominate over individualized ones for Progressive's alleged breach of contract. Mot. 14. "Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." First Invs. Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998). The plaintiffs contend that Progressive breached its duty under the Policy to "determine ACV by the market value, age, and condition of the vehicle at the time the loss occurs" by applying the PSA, which the plaintiffs allege is always an improper deduction that deflates a vehicle's ACV. See Mot. 14–15. In the plaintiffs' view, Progressive has a contractual duty to calculate ACV using a statistically valid methodology. Thus, proof that the PSA deduction is improper will universally advance the resolution of each class member's breach-of-contract claims.

Progressive responds that its duty is only to pay ACV. According to Progressive, even if the PSA were categorically improper, any given class member could establish a breach of the Policy only if that plaintiff showed that Progressive paid less than the ACV. Opp'n 11. Whether Progressive paid ACV is an individualized inquiry into specific vehicle conditions. See id. at 14.

Specifically, the PSA may accurately reflect that a given class member's car would have sold for less than its list price. See id. at 11, 17. Thus, in each case, the determinative issue will be whether Progressive paid less than the vehicle's ACV—an individualized inquiry that would predominate over other questions in the litigation.

Whether the PSA's statistical validity (or lack thereof) will drive the resolution of the plaintiffs' breach-of-contract claim, and thus predominate over individual questions, depends on what the Policy required Progressive to do. To establish liability on a class-wide basis with respect to their breach-of-contract claim, the plaintiffs must show that "the existence of individual injury resulting from Progressive's alleged breach of contract was capable of proof at trial through evidence common to the class rather than individual to its members." Drummond v. Progressive Specialty Ins., 142 F.4th 149, 156 (3d Cir. 2025) (quoting Comcast Corp. v. Behrend, 569 U.S. 27, 30 (2013)). As explained more fully below, individual questions of fact will overwhelm any common questions because ultimately the factfinder must determine whether Progressive paid each class member the ACV for that plaintiff's vehicle.

**1.**

The threshold question in the predominance analysis is whether Progressive owes its policyholders a duty to use a certain methodology or merely a duty to pay ACV. "If the relevant duty" under the Policy "is a duty to pay insureds the actual cash value of their totaled cars, each class member must

show that Progressive underpaid her to prove the breach element of her breach-of-contract claim." Schroeder v. Progressive Paloverde Ins. Co., 146 F.4th 567, 575 (7th Cir. 2025). Individual questions would predominate over other questions in the litigation because proving that the PSA is categorically invalid would not, on its own, establish that Progressive underpaid any given class member. If, on the other hand, "the relevant duty is a methodological duty, each class member must show that Progressive used an invalid method to calculate actual cash value—independent from the result of the calculation—to prove a breach." Id. Methodological duties "tell[] insurers in some detail how to estimate vehicles' actual cash or fair market value." Jama v. State Farm Mut. Auto. Ins. Co., 113 F.4th 924, 932 (9th Cir. 2024), cert. denied, 145 S. Ct. 2793 (2025). If the breach of a methodological duty were sufficient for liability, the class members in this case arguably could establish that Progressive breached the Policy on a class-wide basis by showing that the PSA deduction is categorically improper.

The plaintiffs contend that the Policy imposes a methodological duty to use a valid method to determine the ACV of each vehicle. They argue that the Policy requires Progressive to determine ACV based on "the market value, age, and condition of the vehicle at the time the loss occurs." Policy at 40 (emphasis added). And calculating "market value" requires Progressive to use a methodology consistent with "industry practices and consumer experiences." Mot. 15 (quoting Smith v. S. Farm Bureau Cas. Ins., 18 F.4th 976, 980–81 (8th Cir. 2021)). In the plaintiffs' view, the PSA is not such a methodology because it

artificially lowers ACV across the board and thus fails to approximate "the [vehicle's] fair market value . . . in breach of [Progressive's] contractual duty." Id. Whether the PSA in fact improperly deflates ACV would therefore be a common question across the class that bears directly on the class members' breach claims, irrespective of whether any individual class member's ACV was miscalculated.

The plaintiffs' argument fails, however, because the Policy simply does not, by its language, impose a methodological duty on Progressive. The plaintiffs rely on the Policy's requirement that actual cash value be "determined by market value," but that term alone cannot bear the load. "Determined by market value" supplies merely the measure of ACV—the price at which the vehicle would change hands—not the method of computing it. Similarly, "market value" is simply "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect." Value, Black's Law Dictionary (12th ed. 2024).[4] That definition does not imply the use of any specific method.

This construction of the Policy is consistent with "[t]he essence of an insurance policy," which ordinarily is not a promise that an insurer will use any particular methodology, but rather "a promise by the insurer to compensate the insured for the loss of something of value that is covered under the policy, thereby shifting the risk of loss from the insured to the insurer." Schroeder,

---

4 Black's Law Dictionary uses the same definition for market value and actual cash value. See Value, Black's Law Dictionary (12th ed. 2024).

146 F.4th at 576. Indeed, the Court of Appeals for the Seventh Circuit analyzed the same policy language at issue here—that "actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs," id. at 571—and rejected the plaintiffs' contention that the policy implied any methodological duty. Instead, "Progressive had a duty under the policy to compensate each insured after a total loss for the price at which her car would change hands between a willing buyer and seller at the time of the loss (accounting for the car's age and condition, among other factors), less the applicable deductible." Id. at 576. Therefore, the individual factual question for each plaintiff—namely, whether the plaintiff was paid the ACV for the plaintiff's vehicle—would overwhelm any general determination of whether the PSA was a proper deduction in arriving at that value. Nearly every court of appeals to consider this issue has concluded that the determination of the ACV in each class member's case would overwhelm the general question of whether the PSA is an accurate deduction. See Clippinger v. State Farm Auto. Ins., 173 F.4th 817 (6th Cir. 2026) (en banc); Ambrosio v. Progressive Preferred Ins., 154 F.4th 1107, 1110–13 (9th Cir. 2025) (finding that, unlike in Jama, "there is nothing facially unlawful about Progressive's use of the PSA"); Freeman v. Progressive Direct Ins., 149 F.4th 461, 468–71 (4th Cir. 2025); Schroeder, 146 F.4th at 576–78; Drummond, 142 F.4th at 158–61; Sampson v. United Servs. Auto. Ass'n, 83 F.4th 414, 419–21 (5th Cir. 2023).

The plaintiffs resist this conclusion and argue that the Court should follow the analysis in Volino. But that opinion is unpersuasive for largely the

same reasons that the plaintiffs' arguments in this case are unpersuasive. The court in Volino, for example, held that the question whether the PSA is categorically invalid is susceptible of common proof. But that conclusion rests on the assumption that using an improper adjustment violates the Policy, irrespective of whether any given class member is ultimately paid the vehicle's ACV. As explained above, however, the Policy in this case does not impose any methodological duty—it imposes only a duty to pay the insured the ACV of the insured's pre-crash vehicle.

The plaintiffs also rely extensively on the decision by the Court of Appeals for the Sixth Circuit in Clippinger v. State Farm Automobile Insurance, which concluded that class certification was appropriate because "the insurer's application of an artificial adjustment necessarily results in a class member receiving less than the [ACV]." 156 F.4th 724, 742 (6th Cir. 2025). That conclusion was mistaken because, as explained above, features unique to any given class member's car may neutralize the downward effect of the PSA, which may sometimes result in class members receiving their vehicle's true ACV despite the PSA. Indeed, the full en banc Court of Appeals for the Sixth Circuit reversed the panel's original decision in Clippinger for that reason. The en banc decision held that individual questions of fact as to the ACV of each plaintiff's vehicle overwhelmed any general questions as to the validity of the PSA. Clippinger, 173 F.4th at 832–33 (en banc) (noting that "Clippinger's own appraiser explained that a used car's fair market value depends on 'several

factors,' including 'the year, make and model, mileage, options, and the overall condition of the vehicle' before an accident").

Unable to locate a methodological duty in the language of the Policy itself, the plaintiffs argue that New York law imposes such a duty, irrespective of the Policy's terms. The plaintiffs point specifically to N.Y. Comp. Codes R. & Regs. tit. 11, § 216.7, which allows insurers to calculate the minimum offer for a cash settlement by using "[a] quotation obtained from a computerized database, approved by the superintendent, that produces statistically valid fair market values for a substantially similar vehicle, within the local market area that meets" certain minimum criteria. § 216.7(c)(1)(iii). The plaintiffs acknowledge that the software used by Progressive—WCTL—was approved by the superintendent in 2008, but insist that the PSA is nonetheless categorically invalid because it fails to "produce[] statistically valid fair market values." Id. The plaintiffs argue that Progressive's alleged misuse of the PSA therefore breaches its methodological duty under § 216.7(c)(1), which is incorporated into the Policy "by operation of law." See Mot. 6, 9–11.

This argument fails for several reasons. First, § 216.7(c)(1) does not prohibit negotiation-type adjustments like the PSA. The regulation enumerates the permissible sources of valuation data—two current valuation guides, quotes from qualified local dealers, or an approved computerized database—but says nothing about which adjustments an insurer may make to that data. § 216.7(c)(1)(i)–(iii). The plaintiffs rely heavily on the Ninth Circuit Court of Appeals's decision in Jama v. State Farm Mutual Automobile Insurance Co.,

113 F.4th 924 (9th Cir. 2024), for the proposition that an insurer's use of a uniform downward adjustment to the list price of comparable vehicles presents a class-wide issue that predominates over individualized issues, at least when that downward adjustment violates state regulations. But Jama is distinguishable. That case involved two challenged adjustments—a negotiation adjustment and a condition adjustment—and two corresponding classes. The negotiation adjustment is structurally identical to the PSA at issue in this case, which adjusts comparable list prices to reflect assumed buyer-seller negotiation. The Court of Appeals in Jama ultimately held that the negotiation class was certifiable, reversing the district court's order decertifying it. Id. at 935.

The plaintiffs' theory for the negotiation class in Jama, however, was not merely that the insurer "failed to follow the correct procedure for making permissible adjustments." Id. at 933. Rather, it was "that Washington law does not permit [insurers] to apply a discount for typical negotiation at all." Id. Washington's regulation, Wash. Admin. Code § 284-30-391(4)(b), was construed to permit only enumerated adjustments, such as for options, mileage, and condition, and thus to prohibit non-listed adjustments, like those for assumed negotiation. By contrast, § 216.7 enumerates permissible valuation methods, but it says nothing about which adjustments are permissible. The plaintiffs' theory therefore has no analogue in the New York regulation.

The plaintiffs resist this conclusion by urging that the PSA is no ordinary adjustment. They acknowledge that deriving the value of a comparable vehicle necessarily requires some adjustments—for mileage, condition, and so on. The

plaintiffs argue, however, that the PSA is a categorical downward discount applied across the board based on assumptions about negotiation, and therefore is not comparable to garden-variety adjustments. But the plaintiffs do not locate this prohibition in § 216.7, which nowhere bars a negotiation-type deduction, as the Washington regulation did in Jama.

Second, to the extent § 216.7(c)(1)(iii) imposes any methodological duty, that duty is expressly tethered to the result of the calculation. The subsection allows insurers to use "[a] quotation obtained from a computerized database . . . that produces statistically valid fair market values for a substantially similar vehicle." Id. (emphasis added). Whether Progressive's use of the PSA caused any particular insured to be paid less than the true market value of that particular insured's vehicle is an individualized inquiry that would predominate over other issues in the litigation. See Clippinger, 173 F.4th at 831 (en banc). This case is more analogous to the second proposed class in Jama—the so-called "condition class," which the district court decertified, a conclusion the Court of Appeals affirmed—because "there is no way to know as to any individual class member . . . whether their actual payout was more, less, or equal to what [the insurer] could lawfully have paid." Id. at 936.

Third, the plaintiffs argue that § 216.7(c)(1)'s requirement to choose "one of the following" methods means that Progressive cannot use alternative lower valuations as a defense to breaching its duty. See Pls.' Reply ("Reply") 10–11, ECF No. 107. But they read additional requirements into the regulation. When the regulation specifies "one of the following," § 216.7(c)(1), it does not lock the

insurer into a single valuation system to the exclusion of others. In fact, the options contain multiple valuation systems such as averaging "two valuation manuals" and a database that "produces statistically valid fair market values." Id. at § 216.7(c)(1)(i), (iii). Moreover, the alternative methods are not Progressive "opportunistically seek[ing] out lower valuations." Pls.' Reply at 10–11. Rather, the alternative methods are relevant to determining whether the result of the calculation reflects fair market value. See § 216.7(c)(1)(iii); see also Clippinger, 173 F.4th at 833 (en banc).

**2.**

Neither the language of the Policy nor New York law imposes any methodological duty on Progressive prohibiting it from using the PSA. Progressive's only relevant duty under the Policy is its duty to pay insureds ACV. To prove that Progressive breached the Policy, the plaintiffs therefore must show that "what Progressive actually offered and paid" was less than "the actual cash value based on the unique characteristics of each vehicle and the market in which it was valued." Freeman, 149 F.4th at 469. "Progressive's use of the Projected Sold Adjustment is essentially irrelevant to any alleged breach, and the legitimacy of its practice is certainly not an issue that predominates in resolving whether a breach of contract occurred." Id.

Determining whether each class member was paid less than the vehicle's ACV is an inquiry rife with individualized questions. That inquiry "would involve looking into the actual pre-accident value of the car and then comparing

that with what each person was offered, to see if the offer was less than the actual value." Lara v. First Nat'l Ins. Co. of Am., 25 F.4th 1134, 1139 (9th Cir. 2022). Merely looking at "common evidence that list prices equate to market value will not resolve whether Progressive breached the policy"; instead, "a jury would need to consider a host of individualized questions to resolve the breach issue." Schroeder, 146 F.4th at 577. At most, Progressive's use of the PSA would show an allegedly improper categorical reduction, not necessarily an underpayment for any class member. As the defendants explain, there is a range of possible estimates for each vehicle. See Opp'n at 8–9. Thus, individualized issues will predominate over common ones in determining whether each class member suffered from a breach of contract.

* * *

Progressive's duty under the Policy is to pay ACV. Resolving the question whether the PSA is categorically invalid therefore cannot resolve the plaintiffs' breach-of-contract claim on a class-wide basis. Individualized evidence of ACV will be necessary to determine whether Progressive underpaid each member of the putative class. Accordingly, the plaintiffs have failed to establish that their proposed class satisfies Rule 23(b)(3)'s predominance requirement for the breach-of-contract claim.

**B.**

The plaintiffs argue that class-wide issues and evidence will predominate over individualized issues and evidence for Progressive's alleged violation

of New York General Business Law § 349. See Mot. 18–19. That statute prohibits "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). To state a § 349 claim, "a plaintiff must allege that the defendant engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." City of New York v. Smokes-Spirits.com, Inc., 911 N.E.2d 834, 838 (N.Y. 2009). In addition, to recover under the statute, a plaintiff must demonstrate "actual" injury. Id. at 839. In this case, the plaintiffs allege that Progressive misrepresented to the claimants that the PSA reflects consumer purchasing behavior in a way that would mislead a reasonable consumer. Mot. 18–19.

The plaintiffs' predominance arguments fail for two reasons. First, each class member will have to show "actual injury" for their § 349 claim to prevail. See Smoke-Spirits.com, 911 N.E.2d at 838. For the same reasons as the breach-of-contract claim, showing injury is predominantly an individualized inquiry into whether each class member was paid ACV. See supra at III.A.2.

Second, to prove their § 349 claim, each class member must show that their actual injury was "caused by a materially misleading or deceptive act or practice."[5] Smokes-Spirits.com, 911 N.E.2d at 839. "[T]o have been injured by

---

5 For purposes of § 349, "[w]hether an act is materially misleading is defined objectively and looks to whether the act is likely to mislead a reasonable consumer acting reasonably under the circumstances." Morales v. Kavulich & Assocs., P.C., 294 F. Supp. 3d 193, 197 (S.D.N.Y. 2018). Because this inquiry

[Progressive]'s deceptive act, a plaintiff must have been personally misled or deceived." Fero v. Excellus Health Plan, Inc., 502 F. Supp. 3d 724, 739 (W.D.N.Y. 2020). The plaintiffs never explain how they can show on a class-wide basis that each class member was exposed to the defendants' allegedly deceptive statements. Indeed, several of the named plaintiffs acknowledged that Progressive interacted with and paid any settlement proceeds to the vehicles' lienholders, not the plaintiffs themselves. See, e.g., Narcisse Dep. 50:20–51:4, ECF No. 97-2 ("Q: Did you ever have a conversation with a Progressive agent about the value of your vehicle? A: No. Q: Did you have any conversations with an adjuster about the value of your vehicle? A: I never even spoke to an adjuster."). Determining which class members were exposed to Progressive's alleged misrepresentation requires a member-by-member inquiry—exposure cannot be established by common proof.

The New York Court of Appeals "has cautioned courts against conflating reliance and causation with regard to section 349 claims," Rodriguez v. It's Just Lunch, Int'l, 300 F.R.D. 125, 147 (S.D.N.Y. 2014) (citing Stutman v. Chem Bank, 731 N.E.2d 608 (N.Y. 2000)), because "[i]ntent to defraud and justifiable reliance by the plaintiff are not elements of [a § 349 claim]," Small v. Lorillard Tobacco Co., 720 N.E.2d 892, 897 (N.Y. 1999). But the individualized question

---

is objective, it is subject to generalized proof, and the answer would apply to the class as a whole. But even a common materiality finding would not satisfy the predominance requirement because each class member would still need to prove exposure to the allegedly misleading statement and that the class member's harm was caused by that exposure. See infra at 22.

that each class member will need to answer is not whether the class member relied on Progressive's alleged deception—it is whether the class member's injury was caused by that deception. "[W]hile a plaintiff pursuing a GBL § 349 claim need not have relied on (or even necessarily have believed) the allegedly deceptive conduct, he or she must have at least been exposed to it." Fero, 502 F. Supp. 3d at 740; see also Goshen v. Mut. Life Ins. Co. of N.Y., 774 N.E.2d 1190, 1195 (N.Y. 2002) ("The phrase 'deceptive acts or practices' under the statute is not the mere invention of a scheme or marketing strategy, but the actual misrepresentation or omission to a consumer."); Solomon v. Bell Atl. Corp., 777 N.Y.S.2d 50, 52 (App. Div. 2004) ("[T]o prevail in a cause of action under [General Business Law] §§ 349 and 350, the plaintiff must prove that the defendant made misrepresentations or omissions that were likely to mislead a reasonable consumer in the plaintiff's circumstances, that the plaintiff was deceived by those misrepresentations or omissions and that as a result the plaintiff suffered injury." (emphasis added)).

The plaintiffs argue that Fero is distinguishable because the plaintiffs in that case did not interact with the insurer, whereas in this case, Progressive allegedly "issued WCTL reports to every class member as the contractual basis for settlement." Reply 12. But exposure to the WCTL reports is not exposure to Progressive's allegedly deceptive statement—that is, that the PSA reflects real negotiation. Indeed, because payments ran to lienholders rather than to the plaintiffs—the defining feature of the proposed classes in this case—many class members never saw anything, as the Narcisse deposition shows. In any

event, the factual distinction that the plaintiffs attempt to draw is irrelevant to the ultimate legal question, which is whether the plaintiffs' injury was caused by the alleged deception. Plaintiffs cannot be harmed by a deceptive statement to which they were never exposed, regardless of whether they ever interacted with the insurer. Each class member's claim will depend on the individualized proof of whether that class member was exposed to an allegedly misleading communication from Progressive and the nature of that communication. These individualized questions would predominate over any alleged generalized issues common to the class.

Accordingly, the plaintiffs have failed to satisfy the predominance requirement of Rule 23(b)(3) for the § 349 claim.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the plaintiffs' motion for class certification is **denied**.

**SO ORDERED.**

**Dated: New York, New York**
**July 8, 2026**

**John G. Koeltl**
**United States District Judge**